UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal Action No. 5: 21-047-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| JYOTI AGRAWAL, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Defendant Jyoti Agrawal is charged in a three-count Indictment with conspiring to commit wire fraud in violation of 18 U.S.C. § 1349 (Count 1), wire fraud in violation of 18 U.S.C. § 1343 (Count 2), and engaging in a monetary transaction in property derived from wire fraud in violation of 18 U.S.C. § 1957 (Count 3). [Record No. 1] Agrawal's company, ScienceTomorrow, LLC, applied for and received federal grant funding from the Department of Energy ("DOE") for a quantitative secondary electron detection ("QSED") technology project for scanning electron microscopes. The charges against the defendant relate to her representations to the DOE, as well as the way in which she spent ScienceTomorrow's federal grant money.

Agrawal's trial is set to begin on April 18, 2022. In advance of the trial, she has filed an *omnibus* motion *in limine* to preclude the United States from presenting evidence on a number of matters, including: (1) testimony regarding whether any submission to the DOE was "material"; (2) a subcontract with Penn State University ("Penn State"); (3) issues concerning grants from the Kentucky Science and Technology Corporation ("KSTC"); and (4)

alleged tax issues. [Record No. 44] Agrawal further seeks to exclude the testimony of former employees. [*Id.*] For the reasons set forth below, the defendant's motion will be granted, in part, and denied, in part, while other issues will be reserved for ruling during trial.

### I. Background and the Alleged Offense Conduct

The DOE participates in the Small Business Innovation Research ("SBIR") and Small Business Technology Transfer ("STTR") programs, which "provide funding to small businesses to research, design, develop, and test innovative technology ideas related to specific needs defined in competitive solicitations issued by federal agencies." [Record No. 1, ¶ 1] It solicits applications for SBIR and STTR research projects on a yearly basis, screens the applications, and awards funding based on the information represented in them, including "facility access, consultants, subcontractors, partnerships with scholars and research institutions, budgetary data, and commercialization assistance." [*Id.* at ¶ 3.]

The SBIR and STTR programs have three phases. "In Phase I, the objective is to establish the technical merit, feasibility, and commercial potential of the proposed R&D [*i.e.*, research and development,] efforts and to determine the quality of performance of the small business awardee organization prior to providing further Federal support." [*Id.* at ¶ 2.] A Phase I funding awardee is eligible for Phase II funding, which is provided to continue the research and development efforts begun during Phase I. [*Id.*] "In Phase III, the small business [awardee] pursues the commercialization objectives resulting from the Phase I and II R&D activities." [*Id.*]

The government asserts that Agrawal and her ex-husband, Subhadarshi Nayak, proposed and obtained a $153,696.00 Phase I SBIR grant from the DOE for ScienceTomorrow's QSED project that would last from on or about February 19, 2013, to on

or about November 11, 2013. [*Id.* at ¶ 4.] The project's Phase I activities included a contract with the University of Tennessee at Knoxville ("University of Tennessee"), which they allegedly failed to perform and pay as proposed in their application. [*See id.* at p. 3; Record No. 1, ¶ 9.] The United States also claims that Agrawal and Nayak repurposed the funds meant for that contract and failed to disclose this material fact to the DOE. [Record No. 1, ¶ 9]

Following the conclusion of Phase I, the defendant and Nayak allegedly generated a December 2013 letter in support of Phase II SBIR funding that falsely indicated that the couple had secured an agreement with the University of Tennessee for work on a scanning electron microscope project, which had a proposed budget of $300,006.00. [*Id.* at ¶ 10.] The government contends that the DOE decided to grant $999,266.00 in Phase II funding based, in part, on this falsehood. [*Id.* at ¶ 11.] The United States claims that Agrawal then transmitted a second fake letter to the DOE in December 2015 to induce additional funding for the project, falsely representing that ScienceTomorrow had another agreement with the University of Tennessee. [*Id.* at ¶ 14.]

Additionally, the government alleges that Agrawal and Nayak knowingly retained $319,000.00 of SBIR funds in ScienceTomorrow's bank account after the end of their project's performance period in violation of SBIR guidelines and that the defendant "continued to spend DOE funds . . . as she pleased, knowing this was unlawful and in violation of the terms of the DOE grant and SBIR program guidelines." [*Id.* at ¶ 15.] Relatedly, the government asserts that Agrawal submitted multiple 2017 and 2018 federal reports and certifications that "she knew contained material falsehoods about DOE grant money expenditures" so that she could "avoid detection and the obligation to return any funds." [*Id.* at ¶ 17.] These included false representations in final project certifications that: (1) ScienceTomorrow had received,

- 3 -

expended, and disbursed all Phase I and Phase II funds; and (2) ScienceTomorrow had incurred additional subcontract costs in each phase. [*Id.*]

In furtherance of the conspiracy, Agrawal also allegedly "initiated multiple cost reimbursements via electronic funds transfer to ScienceTomorrow, LLC, via the [United States Treasury Automated Standard Application for Payment ("ASAP") System] based upon fraudulent pretenses and in violation of the Special Terms and Conditions of the DOE Phase II grant." [*Id.* at ¶ 13.] These included a $100,000.00 automated clearing house transfer on August 4, 2016, which forms the basis of Count 2's substantive wire fraud charge. [*Id.* at ¶ 19.]

Finally, the government alleges that Agrawal transferred $24,858.00 in MBA program tuition to the University of Chicago Booth School of Business on August 11, 2016, using proceeds criminally derived from the wire fraud. [*Id.* at ¶ 20.] This transaction forms the basis of Count 3.[1]

## II. Testimony Regarding Materiality

Agrawal first seeks to preclude testimony that any submission to the DOE was "material." [Record No. 44, pp. 4-7] Wire fraud requires "a material misrepresentation or omission." *United States v. Carman*, 186 F. Supp. 3d 657, 661 (E.D. Ky. 2016) (citing *Neder v. United States*, 527 U.S. 1, 25 (1999)); *accord United States v. Daniel*, 329 F.3d 480, 486

---

[1] Although this is the only specific tuition payment charged under § 1957 in the Indictment, the government represents that Agrawal spent "approximately $146,000.00 of DOE grant money to fund her MBA," which serves as an example of how she did not spend the federal funding "as she proposed or certified to the DOE via wire communications." [Record No. 58, p. 2] Thus, this allegation also relates to the Count 1 conspiracy charge and, potentially, the Count 2 substantive wire fraud charge.

(6th Cir. 2003). Accordingly, the materiality of Agrawal's alleged misrepresentations or omissions is critical to the government's case. *See Carman*, 186 F. Supp. 3d at 661.

The defendant concedes that a lay witness may offer ultimate issue testimony under Rule 704 of the Federal Rules of Evidence if a witness is capable of offering such an opinion under Rule 701. [Record No. 44, p. 5] But in Agrawal's estimation, the problem is that testimony about "materiality" would be a legal conclusion beyond the ken of a lay witness. [*Id.* at pp. 5-7.] Additionally, the defendant contends that testimony regarding the materiality of any submission would also be an inappropriate legal conclusion from an expert witness. [*Id.* at p. 7.]

The government states that it will comply with the Rules of Evidence and avoid legal conclusion testimony. [Record No. 58, p. 3] However, it "anticipates lines of questioning, especially with DOE and University of Tennessee-Knoxville (UTK) witnesses, that probe whether certain statements Agrawal made to them influenced their decisions, including the alterations she made to subcontract letters and her omission of certain information in her dealings with them." [*Id.*] This appears to be the appropriate course.

Parties may not attempt to elicit lay or expert opinion testimony regarding the definition of "materiality," as this could invade the province of the court in instructing the jury. *See United States v. Mazumder*, 800 F. App'x 392, 395 (6th Cir. 2020); *United States v. Safa*, 484 F.3d 818, 821 (6th Cir. 2007). Likewise, witnesses may not offer testimony regarding whether an action "was material," as that would be an improper legal conclusion. *See Mazumder*, 800 F. App'x at 395-96; *Safa*, 484 F.3d at 821.

However, there is no general prohibition against "opinions that suggest the answer to the ultimate issue or that give the jury all the information from which it can draw inferences

as to the ultimate issue." *United States v. Volkman*, 797 F.3d 377, 388 (6th Cir. 2015) (quoting *Berry v. Cty. of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994)). Thus, the government may elicit testimony that has significant bearing on whether Agrawal's alleged misrepresentations and/or omissions were material. *See Mazumder*, 800 F. App'x at 395-96; *Safa*, 484 F.3d at 821-22. Indeed, even questions that paraphrase the legal definition of "material" are acceptable so long as they "d[o] not ask the witness to reach the very legal and factual conclusions for which the jury [is] responsible." *Safa*, 484 F.3d at 822.

Accordingly, the defendant's request will be granted to the extent it seeks to exclude questions framed to elicit testimony about the definition of "materiality" or whether the defendant's submissions "were material." But the parties will be able to probe the issue of materiality with questions that do not attempt to elicit such testimony.

### III.  Testimony of Former Employees

Next, Agrawal seeks to preclude testimony from prior ScienceTomorrow employees under Rules 401, 402, 403, 404, and 602. [Record No. 44, pp. 8-12] At base, the defendant asserts that: (1) the former employees have no knowledge of any material and relevant issue in the case (particularly ScienceTomorrow's finances and Agrawal's submissions to the DOE); and (2) they had poor relationships with her such that they would likely offer inadmissible character evidence. [*Id.*]

The United States responds that it may call former ScienceTomorrow employees to testify about "what they did or did not do on the QSED project under Agrawal's direction" in compliance with the Federal Rules of Evidence. [Record No. 58, pp. 3-4] The United States also noted during the pretrial conference in this matter that former employees may specifically testify about ScienceTomorrow's work, or lack thereof, with the University of Tennessee.

The fact that several potential witnesses have or had poor professional relationships with the defendant is not sufficient to require their exclusion under Rule 404. And the basis of their proposed testimony is not character evidence at all. *See* Fed. R. Evid. 404. Thus, the motion will be denied, insofar as it seeks the exclusion of former ScienceTomorrow employees on character evidence grounds.

The testimony of former employees also appears relevant under Rule 401 because it concerns ScienceTomorrow's QSED work during the period at issue, which is of consequence to the jury's ability to reach conclusions about Agrawal's representations regarding that work. This is particularly true of any testimony concerning ScienceTomorrow's dealings with the University of Tennessee. The probative value may be significant, and it is not substantially outweighed by the risk of unfair prejudice, confusing the issues, undue delay, or misleading the jury under Rule 403.

However, the Court will reserve a final determination on relevancy and Rule 403 issues until trial, assuming the United States decides to call any former ScienceTomorrow employee. Similarly, the information available at this time is not adequate to determine whether there is evidence sufficient to support a finding that these potential witnesses have personal knowledge of the matters that may be the subject of their testimony. *See* Fed. R. Evid. 602. Accordingly, the Court reserves ultimate determination on this issue until trial.

### IV. Evidence Concerning the Penn State Subcontract

In addition to the DOE SBIR funding, ScienceTomorrow obtained Phase I SBIR funding for a different project in 2013 from the Office of Naval Research ("ONR"). [Record No. 44-2] ScienceTomorrow's Phase I period of performance for the ONR grant ran from May 13, 2013, through November 8, 2013. [*Id.* at p. 4.] Under a subcontract with Penn State,

university professor Dr. Jogender Singh was to produce research samples for ScienceTomorrow in exchange for $24,000.00 from this ONR grant. [Record No. 44-3, p. 1] The samples were to be delivered in two batches, with "#Invoice 1 for $12,000 [due] one month after submitting the first report and first four samples" and "#Invoice 2 for $12,000 [due] after submitting the second report and the remaining batch of samples." [*Id.* at p. 2.] ScienceTomorrow was obligated to pay the invoices within thirty days of receiving them. [*Id.*] The subcontract had a twelve-month total period of performance, which began on September 19, 2013. [*Id.* at pp. 1, 4.]

Agrawal states that "ScienceTomorrow paid $12,000.00 under the contract for the first task, even though the first invoice from PSU came to it six months after the project close-out date with ONR." [Record No. 44, p. 13] Penn State did not submit a second invoice until May 18, 2015. [Record No. 44-4]

This led to a disagreement between Agrawal and Penn State personnel, which is documented in a 2015 and 2016 email chain produced by the defendant and included on the government's initial exhibit list. [Record No. 44-5] Agrawal advised that "[t]he contract was over and closed in December 2013," prompting a response from Penn State Senior Contracts Administrator Barbara Johnson that payment was appropriate because: (1) the performance period was September 19, 2013, through September 18, 2014; and (2) Dr. Singh performed. [*Id.* at pp. 6-7.] Agrawal responded in a July 3, 2015, email: "As I mentioned the contract [was] closed in December 2013. *Federal doesn't allow us to retain payment/fund beyond the contract year. Unused funds were returned.* I cannot do anything at this point of time." [*Id.* at p. 6 (emphasis added).] Johnson replied, "How could your prime contract have closed in

December 2013 when you awarded [the subcontract] to us with a performance period of 19 September 2013 through 18 September 2014[?]" [*Id.* at p. 5.]

Agrawal and Johnson proceeded to dispute how many samples were delivered. Agrawal eventually offered to pay $6,000.00 out of overhead, rather than project funds, to settle the account. [*Id.* at p. 1.] Johnson later admitted in an email to other individuals (presumably associated with Penn State) that the university was in default on the subcontract because Dr. Singh had actually delivered fewer samples than required. [*Id.*]

The defendant seeks to exclude evidence relating to the Penn State subcontract under Rules 402, 403, and 404. [*See* Record No. 44, pp. 13-15.] She argues that the Penn State subcontract is not relevant because it is not related to the matters charged in the Indictment and the circumstances of the subcontract's performance were different from those of the subcontracts at issue in this case. [*Id.* at p. 13.] Additionally, Agrawal contends that the Penn State subcontract evidence does not "not show any proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident *in this case*" under Rule 404(b)(2) and that it only constitutes inadmissible evidence of a propensity to defraud. [*Id.* at p. 14 (emphasis in original).]

But Agrawal seemingly also concedes that the emails may demonstrate "knowledge or absence of mistake in that [she] knew that unspent SBIR funds must be returned to the government." [*Id.*] Agrawal proposes a stipulation if this is how the government intends to use the Penn State evidence. [*Id.*] Finally, she argues that the presentation of such evidence will require "arguments on offer and acceptance, consideration, partial performance, and breach," resulting in a case within a case that will confuse the issues and mislead the jury. [*Id.*]

The United States filed a Rule 404(b)(3) notice on April 11, 2022,[2] indicating that it intends to introduce the email records to show, *inter alia*, intent, knowledge, absence of mistake, and lack of accident. [Record No. 57, p. 3] Specifically, the government asserts that this evidence will be offered "in anticipation of the defense that the Defendant was merely incompetent at accounting" as well as to demonstrate her intent to defraud. [*Id.* at pp. 3-4.] Additionally, the government observes that the Penn State evidence is similar to the charged conduct in that "the transaction involving Barbara Johnson was for services rendered under an SBIR grant and the Defendant's statements were made after co-conspirator, Subhadarshi Nayak, had left the company during the second phase of the QSED project but before Agrawal submitted her final financial certifications to the United States Department of Energy." [*Id.* at pp. 1-2.] The government also argues that the emails are *res gestae* (intrinsic) evidence. [*Id.* at p. 3 n. 2.]

The United States' response to the pending motion largely reiterates these points. [Record No. 58, pp. 4-6] The government rejects the proposed stipulation but also indicates that it "only seeks to introduce the last two pages of the contract dispute [emails]," *i.e.*, those that contain the emails pertaining to Agrawal's July 3, 2015 concession that unused SBIR funds must be returned to the federal government. [*Id.* at p. 6] The United States asserts that its curtailed proposed exhibit [Record No. 58-1] would "sufficiently sanitize[] the exchange so as not to unfairly prejudice the Defendant." [*Id.* at p. 6.]

---

[2] Rule 404(b)(3) generally requires the government to provide reasonable notice prior to trial of its intent to introduce evidence of other crimes, wrongs, or acts of the defendant offered for permissible purposes under Rule 404(b)(2). The Pretrial and Discovery Order states that "[s]even (7) calendar days prior to trial is presumed to be reasonable notice by this Court." [Record No. 15, ¶ 4(d)(iii)] The government filed the Rule 404(b)(3) notice seven days prior to trial of this action, and the Court accordingly considers the notice timely.

The Court agrees with the United States that the Penn State evidence is admissible for several reasons. First, it may constitute *res gestae* evidence. "*Res gestae* evidence, also described as 'background' or 'intrinsic' evidence, is 'an exception' to the Rule 404(b) bar on propensity evidence." *United States v. Gibbs*, 797 F.3d 416, 423 (6th Cir. 2015). (quoting *United States v. Adams*, 722 F.3d 788, 810 (6th Cir. 2013)).

> Proper background evidence has a causal, temporal or spatial connection with the charged offense. Typically, such evidence is a prelude to the charged offense, is directly probative of the charged offense, arises from the same events as the charged offense, forms an integral part of a witness's testimony, or completes the story of the charged offense.

*United States v. Hardy*, 228 F.3d 745, 748 (6th Cir. 2000).

There is a clear temporal link between the emails and the conduct underlying the charges in this case because they were sent while Phase II of the DOE SBIR project was ongoing prior to the submission of the final certifications cited in the Indictment. And while the emails do not necessarily arise from the same events underlying the charges, they are directly probative of, *inter alia*, the defendant's intent to defraud in this case, inasmuch as they demonstrate that Agrawal was aware of the obligation to return unused SBIR funds, which she allegedly did not do for the QSED project.

But even if the emails are not *res gestae* evidence, the government may use them as Rule 404(b) evidence. A three-step analysis governs the admissibility of Rule 404(b) evidence. *Hardy*, 228 F.3d at 750 (citation omitted). "A party seeking to admit 404(b) evidence must first demonstrate that the other bad acts occurred." *Id.* "The party must then cite a specific purpose for which the evidence is offered . . . ." *Id.* Finally, the Court must determine "whether the probative value of the identified purpose outweighs the risk of unfair prejudice." *Id.*

There is no dispute that the email exchanges accurately depict another act of the defendant. And the government is correct that the "exchange is highly probative of Agrawal's intent, knowledge, and absence of mistake or accident in [regard to] the instant allegations" in that "[i]t is a clear window into the mind of this Defendant, displayed in her own words." [Record No. 58, p. 5] The evidence patently shows that the defendant knew what she was required to do with unused SBIR funds during the relevant period and is particularly probative of whether she can establish defenses that: (1) she did not understand the mechanics of SBIR grant obligations; and/or (2) she did not understand the accounting involved. The probative value is significant and outweighs any risk of unfair prejudice, particularly in light of the curtailed proposed exhibit submitted by the government.

Similarly, the evidence is relevant because it demonstrates, *inter alia*, Agrawal's intent and knowledge during the period in question, which are, of course, facts of consequence in determining the action. *See* Fed. R. Evid. 401. And as suggested above, the Court does not find that the probative value of the evidence is substantially outweighed by the risks articulated in Rule 403. Should counsel's prejudice concerns remain, he may introduce the remaining emails to demonstrate that Agrawal and Penn State had a good faith disagreement about the subcontract's performance. Along similar lines, the Court is not persuaded that the introduction of this evidence will create a case within a case or require counsel to make expansive arguments about contract law. Counsel can, and should, tailor his arguments without belaboring the contract issues.

Thus, Agrawal's request to exclude the Penn State subcontract evidence will be denied. The government may introduce the proposed email exchange exhibit tendered in support of its response in accordance with the above analysis.

## V. Evidence Concerning the KSTC Grants

KSTC awarded ScienceTomorrow grants for the QSED project that partially matched those awarded by the DOE in the amounts of $150,000.00 (Phase I) and $500,000.00 (Phase II). [Record No. 44, p. 15] Agrawal appears to challenge the introduction of evidence suggesting that she intended to defraud KSTC with her Phase II grant proposal. She argues that: (1) she is not on trial for her dealings with KSTC; and (2) the Indictment does not indicate that she would not have received some Phase II grant from the DOE or a matching grant of, at least, $500,000.00 (the amount of the Phase II matching grant from KSTC). [*Id.* at p. 16.] She also contests the introduction of evidence concerning alleged accounting errors in ScienceTomorrow's periodic invoices for KSTC grant money reimbursements. [*Id.*]

The defendant asserts that this evidence is improper character evidence under Rule 404(b)(1), any probative value is greatly outweighed by the risk of unfair prejudice under Rule 403, and there is also a risk of trying a case within a case. [*Id.* at p. 17.] Agrawal also contends that she is at least entitled to an "other acts" instruction if such evidence is admitted.[3]

The United States' Rule 404(b)(3) notice accounts for the KSTC evidence. [Record No. 57] The notice states:

> Agrawal received a matching grant in the amount of $500,000 during the second phase of ScienceTomorrow's QSED project and subject of the indictment. She submitted invoices in order to receive $500,000 in reimbursements for expenses related to the QSED project under this state matching grant. The United States will elicit testimony from Ken Ronald, the Senior Program Manager for the Kentucky SBIR/STTR Matching Funds Program at the time, about the invoices Agrawal submitted to the state matching fund program related to the QSED

---

[3] Agrawal also contests the ability of a KSTC employee, Marie Labrevoux, to testify regarding ScienceTomorrow's dealings with KSTC. [Record No. 44, pp. 15-16] This appears to be a nonissue because, as described below, the government plans to call Ken Ronald to testify about Agrawal's dealings with KSTC. [Record No. 58, p. 7]

project. The United States will elicit testimony from Ken Ronald that he warned the Defendant Agrawal against submitting duplicate expenses.[4]

[*Id.* at p. 2.] According to the government, this evidence will show intent, plan, preparation, knowledge, and absence of mistake. [*Id.* at p. 3.] Regarding absence of a mistake, the notice states that this evidence will show that "Agrawal submitted certifications and budgets to the DOE SBIR Program containing expenditures that, in part, had costs for which she had already been reimbursed [by KSTC]." [*Id.*]

Moreover, the government claims that it "cannot adequately account for the actual expenditures in this case without putting on evidence of this other significant source of funds that the Defendant received during the second phase of the QSED project and comingled with DOE SBIR grant money." [*Id.*] And like the Penn State emails, the United States believes the KSTC evidence also constitutes *res gestae* evidence. [*Id.* at p. 3 n. 2.]

The United States' response elaborates on these points, explaining that "[t]he KSTC evidence is critical" to proving intent to defraud because Agrawal "was forced to account to

---

[4] Government's proposed exhibit 4J, a March 2016 email exchange between Ronald and Agrawal evidences this final point. In the exhibit's first email, Ronald advised Agrawal that a ScienceTomorrow submission for KSTC reimbursement included "at least one duplicate invoice." Ronald required Agrawal to review and revise her submission but also stated, "Your current invoice if paid as submitted would be considered grant fraud possibly punishable by prison and fines." Ronald continued:

> I would like to provide this link to a recent Lexington [Herald Leader] report dated Thursday February 11, 2016. The two individuals in this article are to be sentenced this month for grant fraud. You may know of them. They have two companies that have received both federal and state funded grants[:]
>
> "Lexington couple pleads guilty in federal fraud case"
> http://www.kentucky.com/news/local/crime/article59643771.html

Agrawal provided a revised invoice in a subsequent email documented in the exhibit.

KSTC via Ken Ronald with specific invoices [and] then represented to DOE that she used DOE funding for certain expense aspects that had already been covered with KSTC funds." [Record No. 58, p. 7]  In other words, the government contends that the defendant knowingly obtained federal funds by false pretenses ("double-dipping" on KSTC and federal grant money) and lied about her DOE expenditures in her certifications, as alleged in Paragraphs 13 and 17 of the Indictment. [*See id.* at pp. 7-8.]  The United States also posits that the evidence will show motive for financial gain and that it is relevant and admissible under Rule 403.  [*Id.* at pp. 8-9.]

There is little question that the KSTC evidence constitutes intrinsic *res gestae* evidence under the standard described above.  It is temporally connected to the charged conduct because ScienceTomorrow received funding from the DOE and KSTC at the same time.  Additionally, it arises from the same general events underlying the Indictment, *i.e.*, the QSED project and Agrawal's actions to fund that project.  Moreover, Agrawal admits that the KSTC grants partially matched the federal Phase I and Phase II SBIR grants, and there appears to be no dispute that the KSTC grants were contingent on the corresponding awards of federal funding.

Agrawal's dealings with KSTC are also directly probative of, *inter alia*: (1) ways in which she allegedly defrauded the DOE (through "double-dipping" and false reporting); (2) motive (financial gain); (3) knowledge that she could not lawfully receive duplicative reimbursements for expenses; and (4) an overarching intent to defraud.  The evidence will be critical to the United States' ability to contest a good faith defense based on accounting mistakes or ignorance.  And more fundamentally, it is necessary to "complete the story" of how the defendant funded the QSED project.  This is particularly true if she comingled the KSTC and DOE funds.

Simply put, the KSTC evidence is "inextricably intertwined with criminal act[s] charged." *United States v. Churn*, 800 F.3d 768, 779 (6th Cir. 2015). And because it is clearly intrinsic evidence, Agrawal is not entitled to a Rule 404(b) "other acts" instruction addressing this specific issue.[5] *See United States v. Morris*, No. 5:21-014-DCR, 2021 WL 4228883, at *13 (E.D. Ky. Sept. 16, 2021).

Further, the KSTC evidence is relevant under Rule 401 for the reasons stated above, and the Court has no Rule 403 concerns. Accordingly, the request to exclude evidence concerning the KSTC grants or Agrawal's dealings with the KSTC will be denied.

## VI. Evidence of Tax Issues

Finally, Agrawal challenges the introduction of evidence concerning her tax issues under Rules 402, 403, and 404(b). [Record No. 44, p. 18] The United States explains that it does not intend to present evidence "on tax matters which might show she also failed to pay . . . adequate revenue to the federal government" and that it only seeks to introduce "state W-2 records . . . [that] were relied upon by investigators and [a] forensic accountant to show how the DOE grant money was spent." [Record No. 58, p. 9]

Because the government does not intend to introduce the types of tax evidence targeted by the pending motion, the tax-related request will be denied as moot. Further, the defendant indicated during the pretrial conference that she did not object the introduction of tax evidence

---

[5] However, the evidence at issue would be admissible under Rule 404(b) even if it were not intrinsic evidence. The defendant apparently disputes the interpretation of her duplicative invoicing, but she does not contest that any of the "other acts" occurred. The United States has offered multiple cogent and legitimate reasons why the evidence could be admissible under Rule 404(b)(2), including motive, intent, plan, preparation, knowledge, absence of mistake, and lack of accident. [*See* Record Nos. 57 and 58, pp. 7-9.] Finally, the probative value is significant and easily outweighs the risk of unfair prejudice. Thus, notwithstanding the intrinsic evidence determination above, the KSTC evidence would be admissible.

constituting underlying financial records. Thus, the United States will be permitted to introduce the W-2 records.

### VII. Conclusion

In summary, the defendant's *omnibus* motion *in limine* will be granted, in part, denied, in part, while a portion of the motion will be reserved for ruling during trial. Agrawal's request regarding testimony on "materiality" will be granted to the extent she seeks to preclude the United States from asking questions framed to elicit testimony regarding the definition of "materiality" or whether the defendant's conduct "was material." However, the United States may elicit testimony from witnesses that concerns the materiality of Agrawal's submissions to the DOE and may even paraphrase the standard for materiality so long as it avoids the prohibited questions.

The United States does not intend to call former ScienceTomorrow employees for character evidence purposes and the request to preclude their testimony on Rule 404 grounds will be denied. The Court will reserve determination regarding personal knowledge testimony of any former ScienceTomorrow employees called by the government, the relevancy of such testimony, and 403 issues concerning such testimony for trial if these issues remain in dispute.

Moreover, the curtailed proposed Penn State email exchange exhibit tendered in connection with the United States' response to the pending motion is admissible consistent with the Court's *res gestae* and Rule 404(b) discussion herein. Additionally, the Court does not find the defendant's relevancy and Rule 403 arguments on this issue persuasive. Similarly, the KSTC evidence is clearly *res gestae* evidence. And even if it were not, it would be admissible under Rule 404(b) consistent with the notice filed by the government. Again, the evidence is relevant and has probative value that is not substantially outweighed by Rule 403

concerns. Finally, Agrawal's tax-issues argument is moot because the United States states that it does not intend to introduce the tax evidence at issue in the motion. However, the government will be permitted to introduce the W-2 records.

Based on the foregoing analysis and discussion, it is hereby

**ORDERED** that Defendant Agrawal's *omnibus* motion *in limine* [Record No. 44] is **GRANTED**, in part, **DENIED**, in part, and **RESERVED**, in part, for ruling at trial, consistent with this Memorandum Opinion and Order.

Dated: April 13, 2022.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky